IN THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF TEXAS
HOUSTON DIVISION

| | | |
|---|---|---|
| KYLE BRET CUMMINGS, | § | |
| | § | |
| Plaintiff, | § | |
| | § | |
| v. | § | CIVIL ACTION NO. H-16-1101 |
| | § | |
| NANCY A. BERRYHILL,[1] | § | |
| ACTING COMMISSIONER OF THE | § | |
| SOCIAL SECURITY ADMINISTRATION, | § | |
| | § | |
| Defendant. | § | |

## MEMORANDUM AND RECOMMENDATION

Pending before the court[2] are Defendant's Cross-Motion for Summary Judgment (Doc. 16) and Plaintiff's Motion for Summary Judgment (Doc. 18). The court has considered the motions, Defendant's response to Plaintiff's motion, the administrative record, and the applicable law. For the reasons set forth below, the court **RECOMMENDS** that Defendant's motion be **DENIED** and Plaintiff's motion be **GRANTED**.

## I. Case Background

Plaintiff filed this action pursuant to 42 U.S.C. § 405(g) for judicial review of an unfavorable decision by the Social Security Administration ("SSA") Commissioner ("Commissioner" or "Defendant")

---

[1] Carolyn W. Colvin was the Commissioner of the Social Security Administration ("SSA") at the time that Plaintiff filed this case but no longer holds that position. Nancy A. Berryhill is Acting Commissioner of the SSA and, as such, is automatically substituted as Defendant. See Fed. R. Civ. P. 25(d).

[2] This case was referred to the undersigned magistrate judge pursuant to 28 U.S.C. § 636(b)(1)(A) and (B), the Cost and Delay Reduction Plan under the Civil Justice Reform Act, and Federal Rule of Civil Procedure 72. See Doc. 10, Ord. Dated July 12, 2016.

regarding Plaintiff's claims for disability insurance benefits under Title II of the Social Security Act ("the Act").

## A. <u>Medical History</u>

Plaintiff was born on May 3, 1982, and was eighteen years old on the alleged disability onset date of January 27, 2001.[3] When Plaintiff was a senior in high school, he fell out of the back of a moving pickup truck and suffered a traumatic brain injury ("TBI").[4] A computerized tomography (CT) scan revealed the the injured area of the brain controlled memory, language, and concept-building skills.[5] Plaintiff underwent a craniotomy and was later placed in a medically induced coma for healing.[6] After a lengthy hospitalization, Plaintiff began inpatient rehabilitation at The Institute for Rehabilitation and Research ("TIRR"), where he relearned how to perform basic activities of daily living ("ADLs"), including eating and walking.[7] Two months later, Plaintiff began an extensive outpatient program.[8]

In July 2001, Sunil Kothari, M.D., ("Dr. Kothari"), who treated Plaintiff at TIRR wrote a letter regarding Plaintiff's

---

[3]     <u>See</u> Tr. of the Admin. Proceedings ("Tr.") 164.

[4]     <u>See</u> Tr. 345. Plaintiff had suffered two previous head injuries, one as a six-month old when he fell off the kitchen counter and one as a three- or four-year old when he fell off a bicycle. <u>See</u> Tr. 346.

[5]     <u>See</u> Tr. 345.

[6]     <u>See</u> Tr. 53, 220, 345.

[7]     <u>See</u> Tr. 345.

[8]     <u>See</u> <u>id.</u>

ability to continue his education, stating:

> Although he has shown improvement, he continues to have deficits in the areas of memory, sustained attention, reading comprehension, expressive language skills, and speed of performance. Secondary to these deficits, a college course load of twelve hours is medically contraindicated at this time. We have recommended a maximum of six course hours, and this should be considered a full college course load due to his medical condition.[9]

In April 2007, Plaintiff suffered a seizure while driving and was taken by ambulance to an emergency room for treatment.[10] The treating physician prescribed anti-seizure medications.[11] In January 2013, Plaintiff's prescription medication for seizure control was Tegretol.[12] In April 2013, Plaintiff's prescribed medications were Adderall to aid focus and memory and Carbatrol and Dilantin to prevent seizures.[13] In August 2014, Plaintiff's only prescribed medication was Carbatrol.[14]

On January 17, 2013, Plaintiff underwent a psychological evaluation conducted by Vera A. Gonzales, Ph.D., ("Dr. Gonzales"). Dr. Gonzales interviewed Plaintiff and his father and performed a battery of psychological tests.[15]

---

[9] Tr. 353.

[10] See Tr. 221, 329-42, 345.

[11] See Tr. 329-42.

[12] See Tr. 345.

[13] See Tr. 216.

[14] See Tr. 30.

[15] See Tr. 345-50.

During the interview portion of the evaluation, Plaintiff and his father shared information about the effects of the TBI on Plaintiff's ability to work.[16] Specifically regarding his post-TBI employment, Plaintiff reported that he had been terminated by two employers for unloading boxes from trucks too slowly.[17] Plaintiff "stated that he want[ed] to work but d[id] not do well at the interview" due to memory problems and expressive aphasia, adding that "most places ask for permission to review medical records."[18]

On this point, Dr. Gonzales opined:

> I am concerned with him working because of his memory problems. At this time, I think he might be a danger to himself or to others with his memory problems, especially concerning safety. He was injured in 2001[,] and the TBI literature suggests there is a 24[-]month recovery period where[,] during that time period[,] memories can be recovered and present short[-]term memory will get better overall. If a person has made little or no gain during that 24[-]month recovery time period, it is likely they will not make any more cognitive gain. Given [Plaintiff's] severe memory problems[,] I doubt that he will make any more cognitive gain.[19]

The doctor observed that Plaintiff's speech was "very disjointed" and that his comprehension was delayed.[20] Dr. Gonzales also noted that Plaintiff did "not need to be over heated and overly exerted, especially with consistent or inconsistent

---

[16]    See Tr. 345-46.

[17]    See Tr. 346.

[18]    See id.

[19]    Id.

[20]    Tr. 347.

4

seizures."[21]   With regard to mental status, Dr. Gonzales found

Plaintiff to be oriented to person and partially oriented to place,

time, and situation; however, Plaintiff "was not able to interpret

proverbs at all and confabulated some . . . and had some mild

difficulty understanding and following instructions."[22]  Plaintiff,

who Dr. Gonzales found to have mild obsessive-compulsive ("OCD")

tendencies, stated that he wanted everything in its place and did

not like to shake hands with anyone out of fear of germs.[23]

Plaintiff could not remember the doctor's name and could not recall

a current event, and Dr. Gonzales found that Plaintiff's short-term

memory was poor as evidenced by his inability to recall any of

three objects after five minutes.[24]

Dr. Gonzales concluded that Plaintiff had poor insight, could

not comply with his medical regimen without help, had not been able

to handle his finances, and probably would not be able to finish

his schooling on his own.[25]  Through interpolation, doctor concluded

that Plaintiff's intelligence quotient (IQ) had declined several

points since the TBI.[26]  She stated that Plaintiff's completion of

certification programs in medical assisting and phlebotomy did not

---

[21]   Id.

[22]   Tr. 348.

[23]   See id.

[24]   See id.

[25]   See Tr. 346, 348.

[26]   See Tr. 349.

5

"speak to any recovery of cognitive functioning" as he "appear[ed] to have a hard time putting into words what he [was] feeling, just read, or logical steps to obtain and answer or the reverse."[27]

The memory testing revealed that Plaintiff was poor at learning new material and that his working memory, which "is necessary for staying focused on a task, blocking out distractions, and keeping . . . updated and aware about what's going on around [him]," was impaired.[28]

Dr. Gonzales diagnosed Plaintiff with cognitive disorder, not otherwise specified, secondary to TBI; single-episode major depressive disorder secondary to TBI; generalized anxiety disorder, and OCD traits.[29]  She found his prognosis to be poor and stated that Plaintiff was unable to consistently recall knowledge previously learned and could not consistently learn and retain new knowledge.[30]  Dr. Gonzales recommended that Plaintiff apply for disability benefits.[31]

### B.   Plaintiff's Post-Injury Education and Work History

Plaintiff graduated from high school after the accident[32] and

_____

[27]    Tr. 350.

[28]    Id.

[29]    See Tr. 350-51.

[30]    See Tr. 351.

[31]    See id.

[32]    Plaintiff and his father opined that the high school allowed Plaintiff to graduate with his class without regard to the completion of any remaining schoolwork.  See Tr. 346.

completed two years of college.[33] Plaintiff attended Texas School of Business and Lone Star College, receiving, respectively, certifications as a medical assistant and a phlebotomist.[34] In early 2013, Plaintiff registered to take online medical courses through the University of Phoenix but anticipated needing help from his parents, particularly with writing, because "he ha[d] difficulty putting concepts together."[35]

Plaintiff reported working the following jobs after the accident: (1) delivery driver for a pizza place from September 2003 to May 2006;[36] (2) medical assistant for a podiatrist from July 2006 to November 2006; (3) construction assistant for a remodeling company from February 2007 to March 2007; (4) loader/stocker for a home improvement store from March 2007 to January 2008; (5) unloader/stocker for a department store from March 2008 to June 2008; (6) unloader/stocker for a discount store from June 2008 to September 2008; (7) unloader for another discount store from October 2008 to July 2009; (8) marketer for medical staffing company from June 2012 to July 2012; and sales trainee for a clothing store from February 2013 to May 2013.[37]

---

[33]     See Tr. 214, 345.

[34]     See Tr. 214, 223, 346.

[35]     Tr. 346.

[36]     This was a part-time job that Plaintiff previously held before his TBI and that he continued until the seizures began, requiring him to quit driving temporarily.  See Tr. 441.

[37]     See Tr. 244.

Plaintiff's last employer provided very specific reasons for terminating his employment, stating that "he could not remember policies [and] prices[] and had not 'picked up' on things in the store as quickly as had been expected."[38]

## C. **Application to the SSA**

Plaintiff applied for disability insurance benefits on April 8, 2013, claiming an inability to work since January 27, 2001, due to TGI, memory impairment, speech impairment, and seizures.[39] On April 23, 2013, the SSA found Plaintiff not disabled, labeling the decision a substantial-gainful-activity denial, referring to Plaintiff's post-TBI employment.[40] The assessment of vocational factors that was included in the explanation of the denial stated that no period of work after the alleged onset date was an unsuccessful work attempt ("UWA") and that Plaintiff's post-TBI employment constituted past relevant work.[41] According to the explanation, Plaintiff was capable of past work as a salesman.[42] Plaintiff requested reconsideration of the decision.[43]

On August 15, 2013, an SSA reviewer reconsidered Plaintiff's

---

[38]    Tr. 251 (quoting the employer). Plaintiff's father opined that other employers that had terminated Plaintiff did so for the same reasons. See id.

[39]    See Tr. 164-65, 213.

[40]    Tr. 76.

[41]    See Tr. 80, 90.

[42]    See Tr. 90-91.

[43]    See Tr. 110.

work history since the TBI and stated, "All work from 1/27/01 – [p]resent is Not SGA level work. Or UWAs."[44] The SSA reviewer wrote, "POD [potential onset date] recommended 1/27/01."[45]

In October 2013, Plaintiff and his father each completed function reports.[46] In actuality, Plaintiff's father completed both reports, indicating that he incorporated Plaintiff's input into the one attributed to Plaintiff.[47] The two reports were very consistent with regard to Plaintiff's limitations and abilities.[48] Plaintiff's father stated that Plaintiff's "brain injury cause[d] his memory to fail [and] ma[de] it difficult for him to speak clearly [and] concisely; he t[ook] seizure medication so he g[ot] mentally tired very easily [and] ha[d] trouble following instructions."[49] Plaintiff's father also reported that Plaintiff was living with his "new wife" in Beaumont, Texas, where he took care of his ten-year-old stepson, transported the boy to and from school, watched television, looked for employment, and tried to remain physically active.[50]

According to Plaintiff's father, Plaintiff's wife and her

---

[44]    Tr. 210; see also Tr. 209, 211.  Tr.

[45]    Tr. 210.

[46]    See Tr. 225-233 with Tr. 234-241.

[47]    See Tr. 241.

[48]    Compare Tr. 225-233 with Tr. 234-241.

[49]    Tr. 225.

[50]    Tr. 225-26; see also Tr. 235.

family helped Plaintiff care for the stepson.[51]    According to Plaintiff, he also took care of pets or other animals with the help of his wife and stepson.[52]    Although Plaintiff was able to manage his own personal care, his father stated, Plaintiff needed help counting and remembering to take his medications and used his telephone alarm as a reminder.[53]    Both reported that Plaintiff often needed to nap in the afternoon because he had difficulty sleeping at night and because his brain would become tired later in the day.[54]

They agreed that Plaintiff was able to prepare microwave meals and simple meals a few times per week and to help daily with other meal preparation and that he preferred spicy food after the accident because his sense of taste had dulled.[55]    Plaintiff and his father also agreed that Plaintiff was able to perform most household chores with reminders, "specific instructions," "follow-up," and "some prodding" but that he did not always perform them well and, on occasion, had to redo chores.[56]    Plaintiff's father reported that Plaintiff could complete chores "in good time-if he remember[ed] the task," while Plaintiff said that chores took a

---

[51]    See Tr. 226.

[52]    See Tr. 235.

[53]    See Tr. 226-27, 235-36.

[54]    See Tr. 226, 235.

[55]    See Tr. 227, 236.

[56]    Id.

long time.[57]

According to both men, Plaintiff went outside everyday and was able to go out alone, traveling by foot or car.[58] Plaintiff and his father reported that Plaintiff was also able to shop for personal items, groceries, and clothes at least as frequently as weekly.[59] Plaintiff added that, while shopping, it took him "awhile to make up [his] mind after [he] finally f[ou]nd what [he was] looking for."[60] The two agreed that Plaintiff was capable of traveling alone to a workout facility and other places, such as to the stepson's school, grocery store, and, according to Plaintiff's father, to certain medical appointments but needed reminders.[61] Plaintiff agreed that, on occasion, he needed reminders to go certain places and that, when he was tired, he needed someone to accompany him.[62]

One of the personal areas that Plaintiff could not handle, as identified by his father, was financial matters.[63] In Plaintiff's opinion, he was "maybe" able to handle a savings account but had not tried to perform most of the personal financial activities

---

[57]   Id.

[58]   See Tr. 228, 237.

[59]   See id.

[60]   Tr. 237.

[61]   See Tr. 229, 238.

[62]   See Tr. 238.

[63]   See Tr. 228.

listed, such as paying bills and counting change, "in years, but the last time [he] tried it didn't go well."[64]

Plaintiff's father and Plaintiff stated that he engaged in sports and physical fitness several times a week but left-sided weakness prevented some activities.[65] Plaintiff's father said Plaintiff liked to lift weights with others and to watch sports and television, and Plaintiff added that he enjoyed talking and watching movies with others.[66] As far as interacting with others, Plaintiff's father said that Plaintiff's difficulties with memory and verbalization interfered with his ability to communicate effectively with others and resulted in Plaintiff's becoming "a little more reclusive [and] not as outgoing."[67] Plaintiff reported getting along with almost everyone but not socializing or "hang[ing] out with [his] friends as much" as previously.[68]

On the question asking which abilities were affected by Plaintiff's condition, Plaintiff's father checked the boxes for the following: bending, talking, remembering, completing tasks, concentrating, understanding, and following instructions and placed a question marked by the box for getting along with others.[69] In

---

[64]    Tr. 237.

[65]    See Tr. 54, 229, 238.

[66]    See Tr. 229, 238.

[67]    See Tr. 230.

[68]    Tr. 239.

[69]    See Tr. 230.

addition to the same boxes marked by his father, Plaintiff marked the box for lifting but left the box for getting along with others blank.[70] Plaintiff's father opined that Plaintiff's ability to pay attention depended on the setting and distractions while Plaintiff stated that his ability depended on how much concentration was required.[71] Plaintiff's father rated Plaintiff as below average in following written instructions and stated that, although Plaintiff was able to complete tasks, it was "sometimes with great difficulty."[72] Plaintiff stated that he was "pretty good" at following written instructions if he could keep them with him and that he usually finished what he started.[73] In following spoken instructions, Plaintiff's father reported, Plaintiff had difficulty with tasks that required more than two or three steps.[74] Plaintiff agreed that he could follow spoken instructions if not too long.[75]

Plaintiff's father said that, overall, Plaintiff could get along with authority figures and but that he was sensitive to being called names, that he could become surly, and that he infrequently became angry and frustrated at the slightest things.[76] Plaintiff

---

[70]    See Tr. 239.

[71]    See Tr. 230, 239.

[72]    Tr. 230.

[73]    See Tr. 239.

[74]    See Tr. 230.

[75]    See Tr. 239.

[76]    See Tr. 231.

reported that he usually got along with authority figures "depend[ing] on how they treat[ed] [him]."[77] Stress could cause Plaintiff to become flustered, according to Plaintiff's father, who also reported that Plaintiff preferred a set routine.[78] Plaintiff stated that stress could "sometimes get to [him]" and that others had told him that he had experienced seizures after experiencing stress.[79] Plaintiff suggested that changes in routine affected him more negatively if his established routine had been long term.[80]

Both men identified sleepiness as a side effect of Carbatrol, and Plaintiff's father said that Carbatrol decreased Plaintiff's ability to concentrate.[81] Plaintiff's father concluded his report by stating:

> [Plaintiff's] brain injury . . . has changed his life. His memory [and] his ability to think things through have been dramatically affected. Upon first meeting [Plaintiff], you may not notice these problems, but the more you are around him, his memory, speech, [and] concentration problems become more notic[e]able. These problems have made it very difficult for [Plaintiff] to get a job[] and then keep a job after these problems become more obvious.[82]

As of October 2013, Plaintiff's six prior seizures had occurred in May 2011, February 2012, May 2012, November 2012, March 2013, and

---

[77]    Tr. 240.

[78]    See Tr. 231.

[79]    Tr. 240.

[80]    See id.

[81]    See Tr. 232, 241.

[82]    Id.

April 2013.[83]

On reconsideration, the SSA determined that a consultative examination was necessary because the evidence was not sufficient to support a decision on Plaintiff's claim.[84] On November 15, 2013, Plaintiff underwent the consultative psychological evaluation conducted by Gina L. Evans, Ph.D., ("Dr. Evans").[85] Dr. Evans performed a clinical interview and a battery of psychological tests.[86] Plaintiff attended the evaluation by himself.[87]

Plaintiff explained his difficulties with memory and seizures, stating that he was susceptible to seizures when he was extremely tired or under stress.[88] The information that Plaintiff shared about his ADLs and social functioning was consistent with other contemporaneous reports in the record.[89] Plaintiff also told Dr. Evans about the certifications in medical assisting and phlebotomy, surmising that he was able to succeed in those programs because they were "hands on" and did not involve reading books.[90] Discussing his work history, Plaintiff said that he was terminated

---

[83]    See Tr. 242.

[84]    See Tr. 79-80.

[85]    See Tr. 439-45.

[86]    See Tr. id.

[87]    See Tr. 439.

[88]    See Tr. 440.

[89]    See id.

[90]    See id.

15

at his last job "due to a lack of progression because of memory difficulties" and, prior to that, he was either terminated or forced to quit several jobs "because of his seizures."[91]

Unlike when tested by Dr. Gonzales, Plaintiff exhibited orientation to person and time and knowledge of current events.[92] Although Plaintiff exhibited memory impairment, according to Dr. Evans, Plaintiff was able to name two out of three objects after a delay.[93] Dr. Evans found that Plaintiff also was able to correctly identify three unrelated objects and able to follow written commands and instructions but that he struggled with prolonged concentration.[94]

Dr. Evans rated Plaintiff's academic performance in the low to below average range, his intellectual functioning in the low average range, his verbal comprehension in the low average range, his perceptual reasoning in the average range, his working memory in the average range, and his processing speed in the average range.[95] Dr. Evans found Plaintiff's verbal comprehension was a relative weakness and possibly the result of the TBI.[96]

In summary, Dr. Evans stated that Plaintiff demonstrated mild

---

[91]    See Tr. 441.

[92]    See id.

[93]    See id.

[94]    See id.

[95]    See Tr. 442-44.

[96]    See Tr. 444.

memory difficulties, fluctuating attention, and problems with executive functioning and that his "greatest problems appear to be in concentration, higher order functioning and multi-tasking."[97] The doctor diagnosed Plaintiff with mood disorder due to TBI.[98] Dr. Evans concluded:

> [Plaintiff's] overall prognosis is poor. . . . He has anterograde amnesia. Despite having cognitive rehabilitation, he continues to experience some cognitive difficulties. These deficits appear to be more significant in higher order tasks. He also experiences an increase in mental health[] symptoms post accident. . . . He . . . does not have a history of making poor choices but given his inconsistent attention, problems with advanced thinking and problems with multi-tasking, it would be advised that he receive assistance making appropriate personal, social and occupational choices.[99]

Dr. Evans opined that, although Plaintiff could understand the meaning of filing for disability benefits, he would not able to manage the benefit payments.[100]

On December 3, 2013, Thomas Geary, Ph.D., ("Dr. Geary") reviewed Plaintiff's medical record and completed a Psychiatric Review Technique and Mental RFC Assessment.[101] Dr. Geary opined that the diagnoses of epilepsy and affective disorder were severe but found that neither met or equaled any of the disorders

---

[97]   Tr. id.

[98]   See Tr. 444-45.

[99]   Tr. 445.

[100]   See Tr. 438.

[101]   See Tr. 84-85, 88-89.

17

described in the listings of the regulations[102] (the "Listings"), specifically considering Listing 12.04 (Affective Disorders).[103]

Regarding specific areas, Dr. Geary found that Plaintiff did have understanding and memory limitations and sustained concentration and persistence limitations but that he was not significantly limited in any areas, except "[t]he ability to understand and remember detailed instructions," "[t]he ability to carry out detailed instructions," "[t]he ability to maintain attention and concentration for extended periods," and "[t]he ability to complete a normal workday and workweek without interruptions from psychologically based symptoms and to perform at a consistent pace without an unreasonable number and length of rest periods," with regard to which the doctor found Plaintiff to be moderately limited.[104] Dr. Geary opined, "Claimant can maximally understand, remember, and carry out detailed but not complex instructions, make decisions, attend and concentrate for adequately extended periods, interact adequately with coworkers and supervisors, and respond appropriately to changes in routine work setting."[105] Dr. Geary found that Plaintiff's allegations of mental

---

[102]    20 C.F.R. Pt. 404, Subpt. P, App. 1.

[103]    <u>See</u> Tr. 84.

[104]    Tr. 88-89.

[105]    Tr. 89.

18

limitations were not wholly supported by the record evidence.[106]

On February 11, 2014, Susan Posey, Psy.D., ("Dr. Posey") again reviewed Plaintiff's record and completed a Psychiatric Review Technique and a Mental RFC Assessment.[107] Dr. Posey found epilepsy to be severe and considered Listing 12.04 (Affective Disorders), finding Plaintiff did not meet or equal the criteria.[108] Regarding Plaintiff's RFC, Dr. Posey agreed with Dr. Geary on Plaintiff's mental RFC, including that Plaintiff had understanding and memory limitations and sustained concentration and persistence limitations but was moderately limited in only four specific categories.[109]

Dr. Posey opined that Plaintiff was somewhat limited by his symptoms but was not wholly compromised in his ability to function independently, appropriately, and effectively on a sustained basis.[110] She further stated that Plaintiff could "maximally understand, remember, and carry out detailed but not complex instructions, make decisions, attend and concentrate for adequately extended periods, interact adequately with coworkers and supervisors, and respond appropriately to changes in routine work

---

[106]    See Tr. 85.

[107]    See Tr. 97-99, 102-103.

[108]    See Tr. 97-98.

[109]    See Tr. 102-03.

[110]    Tr. 99.

19

setting."[111]

On February 11, 2014, the SSA issued its determination on reconsideration, again finding Plaintiff not disabled.[112] The SSA changed the prior determination regarding SGA-level work since the alleged disability onset date but did not label any of his work attempts as unsuccessful.[113] The determination remained that Plaintiff was not disabled based on the finding that Plaintiff could perform work that he held after the alleged onset date.[114]

Plaintiff requested a hearing before an administrative law judge ("ALJ") of the SSA.[115] The ALJ granted Plaintiff's request and conducted a hearing on August 19, 2014.[116]

## C. **Hearing**

At the hearing, Plaintiff, Plaintiff's father, and a vocational expert, Wallace A. Stanfill, L.P.C., ("Stanfill"),

---

[111] Tr. 103. Agency physicians also reviewed Plaintiff's physical impairments, but those reports are excluded because Plaintiff does not contest the physical aspects of the RFC finding.

[112] <u>See</u> Tr. 92.

[113] <u>See</u> Tr. 94.

[114] <u>See</u> Tr. 90-92 (citing 20 C.F.R. 404.1520(f), which explains finding a claimant able to perform past relevant work). The explanation for the disability determination on reconsideration continued to list work performed post-TBI as past relevant work even though the SSA reviewer had determined that Plaintiff had performed no SGA-level work after the TBI and, thus, had no past relevant work. <u>See</u> Tr. 94, 210 <u>with</u> Tr. 103-04.

[115] <u>See</u> Tr. 120-21.

[116] <u>See</u> Tr. 27-63, 122-23, 129-34.

testified.[117]  Plaintiff was represented by an attorney.[118]

Plaintiff's attorney began with an opening statement, explaining Plaintiff's TBI and the continuing seizures, which the attorney described as "kind of partially controlled right now."[119] Plaintiff's attorney argued that Plaintiff was on the maximum dosage of Carbatrol, which caused sedative side effects and that Plaintiff's primary work limitation was poor memory.[120]  The attorney reported that Plaintiff had been terminated from jobs because of his inability to perform at a competitive pace and that he had moved home after his one-year marriage ended in divorce.[121]

The attorney then turned to questioning Plaintiff, who stated in response that his last employer hired him full time but decreased his scheduled work hours from four days the first week to one day the next week to four hours per week.[122]  Plaintiff testified that the employer's human resources representative had explained why Plaintiff's hours were decreased so significantly, but he was "mad" at the time and could not recall what she had said.[123]  For eight months prior to getting that particular

---

[117]    See Tr. 27-62, 153.

[118]    See Tr. 27.

[119]    Tr. 32.

[120]    See id.

[121]    See id.

[122]    See Tr. 33-34, 50.

[123]    Tr. 34.

position, the Texas Department of Assistive and Rehabilitative Services had worked with Plaintiff to find employment, to no avail.[124]

In explanation for the difficulty securing a job, Plaintiff stated, "I think it's as soon as I tell them about my seizures, and I take medicine for it, and that it might take me a little bit longer than somebody else to get the routine down, they just—so a liability, I guess, is what they'll say."[125] Plaintiff said that he did not know how to explain his difficulty in "get[ing] things straight" when starting a new job:

> I'm scatter-minded, I guess, a lot, and it takes me a while to—I don't know, it's like I'm told to do one thing a lot of times, and it's like the way I remember it isn't exactly how they tell me it, and it takes me a while to get it down the way they tell me to do it, I guess.[126]

Plaintiff agreed that he eventually can "get it down," but he has to repeat the same task every day, constantly for "it to stick."[127]

Plaintiff described difficulties in his marriage and difficulties with sleeping, taking sleep medication, becoming agitated, experiencing depression, and gaining weight.[128] Plaintiff said that his only outside activity was lifting weights every day,

---

[124]    See Tr. 35.

[125]    Tr. 35.

[126]    Tr. 36.

[127]    Id.

[128]    See Tr. 37-38

which helped him work out his anger.[129]

Plaintiff reported that he had completed vocational training and online college courses with the assistance of his parents:

> Yeah, well, my mom and dad did a lot, so I had to have their help because it's a lot of paper writing, and the papers I write have to have surgery [sic] on them, and they make sense to me, but to everybody else when they start to read it, I heard a lot of oh, my gosh, we need to—what does this mean? What does this mean? But it makes sense to me.[130]

The course work became too difficult, and, after Plaintiff's wedding, he stopped taking classes and did not return.[131]

The ALJ discussed aspects of the reports by Drs. Gonzales and Evans with Plaintiff's attorney, particularly Dr. Evans' opinion in one section that Plaintiff's experienced mild memory difficulties and overall conclusion that Plaintiff's prognosis was poor.[132] Plaintiff's attorney opined that the report was internally inconsistent and the "mild" designation of his memory difficulties was a mistake.[133]

The ALJ then began questioning Plaintiff about his ability to drive and his prior position as a coach for his stepson's team.[134] Plaintiff responded that he began driving again after a six-month

---

[129]     See Tr. 38.

[130]     Tr. 40.

[131]     Tr. 41.

[132]     See Tr. 42-43.

[133]     See Tr. 42.

[134]     See Tr. 43-44.

period without a seizure and only drove the easy, short route to the gym and that he had coached his stepson's team "with a lot of help from other fathers."[135]

Plaintiff stated that, at one of his prior jobs, he had trouble sorting merchandise as he unloaded it from trucks and, therefore, was asked only to remove the boxes from the truck for others to sort.[136] At another job, he was rated at seventy percent of other employees' productivity, according to a work notice given to Plaintiff.[137] Plaintiff's father testified that Plaintiff was terminated from that job "[b]ecause he couldn't remember pricing [and] couldn't remember the tasks that they assigned to him."[138]

Plaintiff's father confirmed the attorney's representation that Plaintiff's most recent employer cut his work schedule to four hours a week because "he couldn't understand things."[139] According to Plaintiff's father, when Plaintiff managed to get hired despite revealing the TBI, he had "a hard time remembering specific aspects or tasks that he'[d] been told to do, and so he'[d] had a hard time keeping jobs in that regard."[140] In response to the attorney's statement that Plaintiff could not sustain employment over a six-

---

[135]    Tr. 44; <u>see also</u> Tr. 43, 56, 57.

[136]    <u>See</u> Tr. 47.

[137]    <u>See</u> Tr. 48.

[138]    Tr. 49.

[139]    Tr. 50.

[140]    Tr. 51.

or twelve-month period, Plaintiff's father stated, "That [had] been his history, correct."[141]

Plaintiff's father explained that more repetitive jobs, like unloading trucks or stocking, were easier for him but were usually part-time jobs, and, even if he found such employment on a full-time basis, Plaintiff would struggle to work a full workweek because of the side effects of his medication.[142] Plaintiff's father estimated, based on Plaintiff's work history, that Plaintiff could not work more than twenty to twenty-five hours per week.[143]

Plaintiff's father said that Plaintiff was able to pass the phlebotomy class work because his mother, who was a teacher, helped him remember lessons from one day to the next through repetition.[144] Plaintiff's father shared that he and his wife had "tried to figure out something for [Plaintiff] to be able to do to just sustain himself to live on his own, and [they] just [had not] been able to find it."[145]

At the conclusion of Plaintiff's father's testimony, Stanfill took the stand and, when asked about Plaintiff's past relevant work, stated, "Well, most years there was some element of

---

[141]    Tr. 54.

[142]    See Tr. 52.

[143]    See id.

[144]    See Tr. 56.

[145]    Id.

employment, Judge, and possibly some quarters were earned at the SGA level, but I just want to note there was no ongoing sustained employment."[146]   The ALJ presented the following hypothetical individual:

> [A]ssume for me if we have someone of the same age and education as the claimant, no past relevant work experience, and if this person could work at a medium exertional level . . . . [H]owever, there are a number of non-exertional limitations I'd like to give to you.
> First of all, this person should not climb ladders, ropes or scaffolding.  This person should not . . . have jobs requiring balance.  This person should not have jobs requiring working with or around hazards, dangerous machinery, or equipment, or unprotected heights, and no jobs requiring driving.  I addition, this person could understand, remember, and carry out only simple one, two, or three-step routine, repetitive tasks.[147]

Stanfill stated that such an individual would be able to perform work a number of medium, unskilled jobs, such as laundry worker, hand packager, industrial sweeper or cleaner, all of which were represented in sufficient numbers in the regional and national economies.[148]

The ALJ adjusted the hypothetical person's limitations by adding that the person would be able to maintain attention and concentration for no more than six hours per workday and would not be able to perform the work duties the remainder of the workday.[149]

---

[146]    Tr. 58.

[147]    Tr. 59.

[148]    See Tr. 60.

[149]    See id.

Stanfill responded that such a person would not be able to maintain employment on a competitive level.[150]  The ALJ then clarified that the second hypothetical individual would not be able to remember the simple instructions for the entire workday.  Stanfill repeated the conclusion that no jobs would be available, stating, "Many of these unskilled jobs would allow for occasional prompting, but not redelivering of instructions" on a regular basis.[151]

## D.  Commissioner's Decision

On October 24, 2014, the ALJ issued an unfavorable decision.[152] The ALJ found that Plaintiff met the requirements of insured status through September 30, 2014, and that Plaintiff had not engaged in substantial gainful activity from January 27, 2001, the alleged onset date, through the date of the ALJ decision.[153]

In the course of addressing severe impairments and the Listings, the ALJ discussed Plaintiff's TBI in 2001 and subsequent treatment (including the history of delayed onset seizures several years after the injury), the treatment notes of Plaintiff's medical doctors, Dr. Gonzales' January 2013 psychological evaluation, Dr. Evans' November 2013 psychological evaluation, the agency physicians' opinions based on review of the record, Plaintiff's

---

[150]    See Tr. 60-61.

[151]    Tr. 61.

[152]    See Tr. 8-22.

[153]    See Tr. 11, 13.  The ALJ noted that Plaintiff worked after the alleged onset date, but the work did not rise to the level of SGA.  Tr. 13.

27

statements about his limitations, and Plaintiff's father's testimony.[154] The ALJ mentioned Plaintiff's successful completion of two years of college and two certification courses with the assistance of his parents and Plaintiff's father's testimony about Plaintiff's UWAs since the accident.[155]

The ALJ determined that the identified severe impairments, individually or collectively, did not meet or medically equal any of the Listings, specifically addressing Listing 11.02 (Epilepsy—convulsive epilepsy), Listing 11.03 (Epilepsy—nonconvulsive epilepsy),[156] Listing 11.18 (Cerebral Trauma), Listing 12.02 (Organic Mental Disorders), Listing 12.04 (Affective Disorders), and Listing 12.06 (Anxiety Related Disorders).[157]

With regard to the Neurological Disorders (11.00 Listings), the ALJ decided that the record lacked evidence of Listing-level severity.[158] The ALJ addressed the Mental Disorders (12.00

---

[154]    See Tr. 16-20.

[155]    See Tr. 15-20.

[156]    The SSA revised the Listings for neurological disorders, consolidating all epilepsy Listings into one and reserving Listing 11.03 for future use.  See DI 27516.010 Disability Determination Services (DDS) Medical Evaluation Criteria to Determine Applicability of Res Judicata, SSA (Oct. 4, 2016), https://secure.ssa.gov/poms.nsf/lnx/0427516010; compare 20 C.F.R. Pt. 404, Subpt. P, App. 1 §§ 11.02, 11.03 (2014) with 20 C.F.R. Pt. 404, Subpt. P, App. 1 § 11.02 (2017)

[157]    See Tr. 14.

[158]    See id.

28

Listings) in more detail.[159]  Citing to Dr. Evans' consultative evaluation and the hearing testimony, the ALJ concluded that Plaintiff experienced mild restrictions in the performance of ADLs, mild difficulties in social functioning, moderate difficulties in concentration, persistence or pace, and no episodes of decompensation of extended duration and, therefore, did not meet the criteria of paragraph B of each Listing considered.[160]  The ALJ also found that paragraph C of each Listing was not met.[161]

In addressing Plaintiff's RFC to perform work-related activities, the ALJ explained the weight he accorded the physicians' opinions and the Plaintiff's testimony.  The ALJ gave "some weight to Dr. Gonzales' opinion but only to the extent that it establishes severity, because Dr. Gonzales' assessment is not consistent with the overall record."[162]  The ALJ did not cite any specific inconsistency between Dr. Gonzales' assessment and the record.[163]  On the other hand, the ALJ gave Dr. Evan's assessment "great weight" because it "adequately evaluates [Plaintiff's] overall mental functioning."[164]  The ALJ also gave "great weight" to Drs. Geary and Posey's opinions "because they are generally

---

[159]    See Tr. 14-16.

[160]    See Tr. 15.

[161]    See id.

[162]    Tr. 18.

[163]    See id.

[164]    Tr. 19.

consistent with the overall record."[165]  The ALJ noted that he gave

"additional consideration" to Plaintiff's subjective complaints and

found Plaintiff limited to "simple work."[166]  The ALJ concluded:

> The [Plaintiff's] allegations of functional limitation
> are not supported by medical record signs, objective
> testing or the record as a whole.  In fact, the record
> reflects that the [Plaintiff's] seizures are controlled
> with medication and that his anger, frustration and
> irritability decrease with therapy.  In addition, the
> claimant was able to complete two certificate programs as
> well as continue attending college courses after the
> alleged onset date which indicates that the claimant is
> not as limited as he alleges.[167]

The ALJ concluded that Plaintiff was capable of performing

medium work with the additional limitations of never balancing or

climbing ropes, ladders, or scaffolds and, due to seizures, of

avoiding hazardous work environments, unprotected heights,

dangerous equipment, and driving.[168]  The ALJ also included the

mental limitation of performing only simple, three-step, routine,

repetitive tasks.[169]

Relying on Stanfill's hearing testimony, the ALJ found that

Plaintiff had no past relevant work performed at a level consistent

with SGA.[170]  The ALJ noted that Plaintiff was a younger individual

---

[165]   Tr. 20.

[166]   Id.

[167]   Id.

[168]   See Tr. 16.

[169]   See id.

[170]   See Tr. 21.

with a high school education and the ability to communicate in English and that transferability of job skills was not an issue because Plaintiff had no past relevant work.[171]  The ALJ acknowledged that, if Plaintiff had been capable of performing a full range of medium work, the Medical-Vocational Guidelines[172] ("the Grid") would direct a finding of "not disabled."[173]  However, the ALJ's RFC assessment was that Plaintiff's ability to perform a full range of medium work was impeded by additional limitations; thus, the ALJ explained, he relied on the testimony of Stanfill to determine whether Plaintiff could perform other work.[174]

Based on Stanfill's response to the ALJ's hypothetical question asking whether a person with Plaintiff's age, education, work experience, and RFC could perform jobs available in the state and national economy, the ALJ stated that he found Plaintiff capable of performing the requirements of the medium, unskilled occupations of laundry worker, hand packager, and industrial cleaner.[175]  The ALJ found that Plaintiff had not been under a disability from January 27, 2001, through March 29, 2013, the date of the ALJ's decision.[176]

---

[171]  See id.

[172]  20 C.F.R. Pt. 404, Subpt. P, App. 2.

[173]  See Tr. 21.

[174]  See id.

[175]  See Tr. 21-22.

[176]  See Tr. 22.

Plaintiff appealed the ALJ's decision, and, on February 5, 2016, the Appeals Council denied Plaintiff's request for review.[177] The Appeals Council acknowledged the submission of a January 2015 evaluation but found it to be "new information . . . about a later time" than the period covered by the ALJ's decision.[178] The Appeals Council informed Plaintiff that he must reapply for a determination of whether he was disabled after October 24, 2014.[179] The Appeals Council's decision transformed the ALJ's decision into the final decision of the Commissioner. After receiving the Appeals Council's denial, Plaintiff sought judicial review of the decision by this court.[180]

## II.  Standard of Review and Applicable Law

The court's review of a final decision by the Commissioner denying disability benefits is limited to the determination of whether: 1) the ALJ applied proper legal standards in evaluating the record; and 2) substantial evidence in the record supports the decision.  Waters v. Barnhart, 276 F.3d 716, 718 (5th Cir. 2002).

## A.  Legal Standard

In order to obtain disability benefits, a claimant bears the ultimate burden of proving he is disabled within the meaning of the

---

[177]    See Tr. 1-7.

[178]    Tr. 2.

[179]    See id.

[180]    See Doc. 1, Pl.'s Orig. Compl.

Act.  Wren v. Sullivan, 925 F.2d 123, 125 (5ᵗʰ Cir. 1991).  Under

the applicable legal standard, a claimant is disabled if he is

unable "to engage in any substantial gainful activity by reason of

any medically determinable physical or mental impairment. . . which

has lasted or can be expected to last for a continuous period of

not less than twelve months."  42 U.S.C. § 423(d)(1)(a); see also

Greenspan v. Shalala, 38 F.3d 232, 236 (5ᵗʰ Cir. 1994).  The

existence of such a disabling impairment must be demonstrated by

"medically acceptable clinical and laboratory diagnostic" findings.

42 U.S.C. § 423(d)(3), (d)(5)(A); see also Jones v. Heckler, 702

F.2d 616, 620 (5ᵗʰ Cir. 1983).

To determine whether a claimant is capable of performing any

"substantial gainful activity," the regulations provide that

disability claims should be evaluated according to the following

sequential five-step process:

> (1) a claimant who is working, engaging in a[n SGA], will
> not be found to be disabled no matter what the medical
> findings are; (2) a claimant will not be found to be
> disabled unless he has a "severe impairment;" (3) a
> claimant whose impairment meets or is equivalent to [a
> Listing] will be considered disabled without the need to
> consider vocational factors; (4) a claimant who is
> capable of performing work that he has done in the past
> must be found "not disabled;" and (5) if the claimant is
> unable to perform his previous work as a result of his
> impairment, then factors such as his age, education, past
> work experience, and [RFC] must be considered to
> determine whether he can do other work.

Bowling v. Shalala, 36 F.3d 431, 435 (5ᵗʰ Cir. 1994); see also 20

C.F.R. §§ 404.1520, 416.920.  The analysis stops at any point in

the process upon a finding that the claimant is disabled or not disabled. <u>Greenspan</u>, 38 F.3d at 236.

## B. <u>Substantial Evidence</u>

The widely accepted definition of "substantial evidence" is "that quantum of relevant evidence that a reasonable mind might accept as adequate to support a conclusion." <u>Carey v. Apfel</u>, 230 F.3d 131, 135 (5th Cir. 2000). It is "something more than a scintilla but less than a preponderance." <u>Id.</u> The Commissioner has the responsibility of deciding any conflict in the evidence. <u>Id.</u> If the findings of fact contained in the Commissioner's decision are supported by substantial record evidence, they are conclusive, and this court must affirm. 42 U.S.C. § 405(g); <u>Selders v. Sullivan</u>, 914 F.2d 614, 617 (5th Cir. 1990).

Only if no credible evidentiary choices of medical findings exist to support the Commissioner's decision should the court overturn it. <u>Johnson v. Bowen</u>, 864 F.2d 340, 343-44 (5th Cir. 1988). In applying this standard, the court is to review the entire record, but the court may not reweigh the evidence, decide the issues de novo, or substitute the court's judgment for the Commissioner's judgment. <u>Brown v. Apfel</u>, 192 F.3d 492, 496 (5th Cir. 1999). In other words, the court is to defer to the decision of the Commissioner as much as is possible without making its review meaningless. <u>Id.</u>

## III. Analysis

Plaintiff requests judicial review of the ALJ's decision to deny disability benefits and asserts that the ALJ committed multiple errors, including failing to provide a full evaluation of Listing 12.02 (Organic Mental Disorders), failing to consider all of the evidence, failing to include all of Plaintiff's limitations in the hypothetical scenario presented to the vocational expert, and failing to make a credibility determination regarding the testimony of Plaintiff's father. Plaintiff also complains that the Appeals Council failed to consider new and material evidence. Defendant argues that the ALJ's decision is legally sound and is supported by substantial evidence.

The court first addresses Plaintiff's assertion that the ALJ failed to consider Plaintiff's lack of success at multiple jobs over an extended period and that the decision lacks substantial evidence to support a finding that Plaintiff could sustain full-time competitive employment. Finding in Plaintiff's favor on this issue, the court need not consider Plaintiff's other arguments.

## A. **Discussion**

Pursuant to the Act, an ALJ is given the tasks of making factual findings and disability determinations. See 42 U.S.C. § 405(b)(1). When the decision is unfavorable, in whole or in part, it must "contain a statement of the case, in understandable language, setting forth a discussion of the evidence[] and stating the Commissioner's determination and the reason or reasons upon

which it is based." Id. "[T]he ALJ is not always required to do an exhaustive point-by-point discussion" but must offer support for his conclusions so that a reviewing court can determine whether the decision is based on substantial evidence. Audler v. Astrue, 501 F.3d 446, 448 (5th Cir. 2007)(quoting Cook v. Heckler, 738 F.2d 1168, 1172 (4th Cir. 1986)).

In reaching a decision on RFC, the ALJ is required to perform a function-by-function assessment of "an individual's ability to do sustained work-related physical and mental activities in a work setting on a regular and continuing basis" and to "discuss the individual's ability to perform sustained work activities in an ordinary work setting on a regular and continuing basis." Myers v. Apfel, 238 F.3d 617, 620 (5th Cir. 2001)(quoting Soc. Sec. Ruling ("SSR") 96-8p, 1996 WL 374184, at **1, 7). The SSA defined "regular and continuing basis" as eight hours a day, five days a week or an equivalent work schedule. SSR 96-8p, 1996 WL 374184, at **1, 2.

The ALJ's critical error in this case was that, in assessing Plaintiff's RFC, he failed to discuss whether Plaintiff could sustain employment on a regular and continuing basis when determining Plaintiff's mental RFC. Granted, the ALJ acknowledged that none of Plaintiff's work since the TBI was at an SGA level because it was not both substantial in that it required significant physical or mental activities and gainful in that it was performed

for profit.  However, the ALJ used this finding only to propel Plaintiff past step one of the analysis.

The ALJ also specifically mentioned Plaintiff and his father's testimony that Plaintiff was unable to work because of seizures, memory problems, scattered thoughts, medication side effects, and other problems and that Plaintiff was unable to sustain employment for more than six months, even on a part-time basis.  The ALJ further acknowledged Plaintiff's father's testimony that two employers terminated Plaintiff due to his inability to remember or understand his duties.  However, the ALJ failed to discuss how, despite evidence to the contrary, Plaintiff was able to "perform sustained work activities in an ordinary work setting on a regular and continuing basis," as required.  <u>Myers</u>, 238 F.3d at 620.

This legal error was compounded by a lack of substantial record evidence supporting the ALJ's implied conclusion that Plaintiff could perform "sustained work-related physical and mental activities in a work setting on a regular and continuing basis." <u>Id.</u>  The only evidence that arguably supports such a finding is Dr. Posey's concluding remark on review of the record that Plaintiff was able function independently, appropriately, and effectively on a sustained basis.  This comment only speaks to Plaintiff's ability to *function* not to the salient question whether Plaintiff could perform *work activities* on a sustained basis.  Therefore, it does not provide any evidence that he could sustain employment.

On the other hand, the record is replete with evidence that Plaintiff could not sustain work on a regular and continuing basis. The most obvious evidence is his work history that included numerous part-time and short-term jobs. The testimony of Plaintiff and his father, as well as feedback from former employers clearly indicate that Plaintiff's mental impairments interfered with his ability to learn the assigned tasks and/or to perform those tasks at a pace acceptable to his employers. Additionally, the August 2013 SSA reviewer opined that Plaintiff's past work was either not SGA level or was UWAs, supporting the conclusion that, despite Plaintiff's efforts, he had failed to perform sustained work-related mental activities on a continuing basis.[181]

The ALJ's determination that Plaintiff was not disabled is in error because he failed to discuss Plaintiff's ability to maintain the jobs identified by the vocational expert on a regular and continuing basis and is not supported by substantial evidence.

**B.  Disposition**

On this basis alone, the ALJ's decision must be reversed. This is the rare situation in which the court may render a favorable disability determination without remanding the decision for further consideration.  This is so because the vocational

---

[181]    As further support, Dr. Kothari's opinion, soon after the accident, that Plaintiff would be unable to maintain a full-time college schedule and the reflections that Plaintiff was able to achieve educational success only with significant assistance from his parents counter a finding that Plaintiff could sustain employment on his own.

expert provided the definitive answer for Plaintiff's situation.

The ALJ presented the vocational expert with the salient hypothetical scenario, one that included the question whether an individual who could not adequately perform his job for more than six hours a day due to the inability to sustain attention and concentration or to remember simple instructions. These were the problems identified in the evidence as experienced by Plaintiff in past employment. The vocational expert testified that such an individual would not be employable.

The court should reverse the Commissioner's decision and render a finding of disabled in favor of Plaintiff.

### IV. Conclusion

Based on the foregoing, the court **RECOMMENDS** that Defendant's motion be **DENIED** and Plaintiff's motion be **GRANTED**.

The Clerk shall send copies of this Memorandum and Recommendation to the respective parties who have fourteen days from the receipt thereof to file written objections thereto pursuant to Federal Rule of Civil Procedure 72(b) and General Order 2002-13. Failure to file written objections within the time period mentioned shall bar an aggrieved party from attacking the factual findings and legal conclusions on appeal.

The original of any written objections shall be filed with the United States District Clerk electronically. Copies of such objections shall be mailed to opposing parties and to the chambers

of the undersigned, 515 Rusk, Suite 7019, Houston, Texas 77002.

**SIGNED** in Houston, Texas, this 19<u>th</u> day of May, 2017.

_____
U.S. MAGISTRATE JUDGE